918 So.2d 240 (2005)
THE FLORIDA BAR, Complainant,
v.
John Robert PAPE, Respondent.
The Florida Bar, Complainant,
v.
Marc Andrew Chandler, Respondent.
Nos. SC04-40, SC04-41.
Supreme Court of Florida.
November 17, 2005.
*241 Barry S. Richard and M. Hope Keating of Greenberg Traurig, P.A., Tallahassee, FL, for Complainant.
John Robert Pape and Marc Andrew Chandler, Pro se, Fort Lauderdale, FL, for Respondents.
PARIENTE, C.J.
In this case we impose discipline on two attorneys for their use of television advertising *242 devices that violate the Rules of Professional Conduct. These devices, which invoke the breed of dog known as the pit bull, demean all lawyers and thereby harm both the legal profession and the public's trust and confidence in our system of justice.[1]
We conclude that attorneys Pape and Chandler ("the attorneys") violated Rules Regulating the Florida Bar 4-7.2(b)(3) and 4-7.2(b)(4) by using the image of a pit bull and displaying the term "pit bull" as part of their firm's phone number in their commercial. Further, because the use of an image of a pit bull and the phrase "pit bull" in the firm's advertisement and logo does not assist the public in ensuring that an informed decision is made prior to the selection of the attorney, we conclude that the First Amendment does not prevent this Court from sanctioning the attorneys based on the rule violations. We determine that the appropriate sanctions for the attorneys' misconduct are public reprimands and required attendance at the Florida Bar Advertising Workshop.

BACKGROUND AND PROCEDURAL HISTORY
On January 12, 2004, The Florida Bar filed complaints against the attorneys, alleging that their law firm's television advertisement was an improper communication concerning the services provided, in violation of the Rules of Professional Conduct. The advertisement included a logo that featured an image of a pit bull wearing a spiked collar and prominently displayed the firm's phone number, 1-800-PIT-BULL. The Bar asserted that this advertisement violated the 2004 version of Rules Regulating the Florida Bar 4-7.2(b)(3) and 4-7.2(b)(4), which state:
(3) Descriptive Statements. A lawyer shall not make statements describing or characterizing the quality of the lawyer's services in advertisements and written communications; provided that this provision shall not apply to information furnished to a prospective client at that person's request or to information supplied to existing clients.
(4) Prohibited Visual and Verbal Portrayals. Visual or verbal descriptions, depictions, or portrayals of persons, things, or events must be objectively relevant to the selection of an attorney and shall not be deceptive, misleading, or manipulative.[2]
The referee found that the attorneys did not violate rule 4-7.2(b)(3), relying on the *243 distinction that the logo and telephone number "describe qualities of the respondent attorneys" but do not describe or characterize "the quality of the lawyer services." The referee also rejected the Bar's assertion that the ad violated rule 4-7.2(b)(4). After noting that pit bulls are perceived as "loyal, persistent, tenacious, and aggressive," the referee found these qualities
objectively relevant to the selection of an attorney as they are informational, because these are qualities that a consuming public would want in a trial lawyer ... and the ad is not improperly manipulative. ... The advertisement is tastefully done, the logo is not unduly conspicuous in its replacement of an ampersand between respondents' names atop the TV screen, and the large print 1-800 number is an effective mnemonic [device] tailored to maximize responses from potential clients.
The referee also concluded that the ad was protected speech and therefore that an interpretation of rules 4-7.2(b)(3) and 4-7.2(b)(4) to prohibit the ad would render the rules unconstitutional as applied.

ANALYSIS
Generally, a "referee's findings of fact regarding guilt carry a presumption of correctness that should be upheld unless clearly erroneous or without support in the record." Fla. Bar v. Senton, 882 So.2d 997, 1001 (Fla.2004) (quoting Fla. Bar v. Wohl, 842 So.2d 811, 814 (Fla.2003)). However, where there are no genuine issues of material fact and the only disagreement is whether the undisputed facts constitute unethical conduct, the referee's findings present a question of law that the Court reviews de novo. See Rykiel v. Rykiel, 838 So.2d 508, 510 (Fla.2003) (stating that if the issue presented in a decision is a pure question of law, the decision is subject to de novo review); Fla. Bar v. Cosnow, 797 So.2d 1255, 1258 (Fla.2001) (concluding that whether the attorney's admitted actions constitute unethical conduct is a question of law). The facts are not in dispute, and therefore our review is de novo.

A. Violation of Attorney Advertising Rules
As a preliminary matter, the pit bull logo and 1-800-PIT-BULL telephone number in the ad by the attorneys do not comport with the general criteria for permissible attorney advertisements set forth in the comments to section 4-7 of the Rules of Professional Conduct. The rules contained in section 4-7 are designed to permit lawyer advertisements that provide objective information about the cost of legal services, the experience and qualifications of the lawyer and law firm, and the types of cases the lawyer handles. See generally R. Regulating Fla. Bar 4-7.1 cmt. The comment to rule 4-7.1 provides that "a lawyer's advertisement should provide only useful, factual information presented in a nonsensational manner. Advertisements using slogans ... fail to meet these standards and diminish public confidence in the legal system." The television commercial at issue here uses both a sensationalistic image and a slogan,[3] contrary to the purpose of section 4-7.
More specifically, the attorneys' ad violated rule 4-7.2(b)(3), which prohibits the use of statements describing or characterizing the quality of the lawyer's services. *244 In Florida Bar v. Lange, 711 So.2d 518, 521-22 (Fla.1998), we approved the referee's finding that an advertisement that stated "When the Best is Simply Essential" violated the predecessor provision to rule 4-7.2(b)(3) because it was self-laudatory and purported to describe the quality of the lawyer's services. In this case, the simultaneous display of the pit bull logo and the 1-800-PIT-BULL phone number conveys both the characteristics of the attorneys and the quality of the services they purport to provide. At the very least, the printed words and the image of a pit bull in the television commercial could certainly be perceived by prospective clients as characterizing the quality of the lawyers' services.
On this question we disagree with the referee, who distinguished the "quality of the lawyer's services" from the qualities (i.e., traits or characteristics) of the lawyer. We conclude that this is an artificial distinction which unduly limits the scope of the rule by interpreting "quality of the lawyer's services" in the narrowest sense. From the perspective of a prospective client unfamiliar with the legal system and in need of counsel, a lawyer's character and personality traits are indistinguishable from the quality of the services that the lawyer provides. A courteous lawyer can be expected to be well mannered in court, a hard-working lawyer well prepared, and a "pit bull" lawyer vicious to the opposition. In the attorneys' advertisement, the pit bull image appears in place of an ampersand between the attorneys' names, and the ad includes the use of the words "pit bull" in the attorneys' telephone number in large capital letters. The combined effect of these devices is to lead a reasonable consumer to conclude that the attorneys are advertising themselves as providers of "pit bull"-style representation. We consider this a characterization of the quality of the lawyers' services in violation of rule 4-7.2(b)(3).
We also conclude that the ad violates rule 4-7.2(b)(4), which requires that visual or verbal depictions be "objectively relevant" to the selection of an attorney, and prohibits depictions that are "deceptive, misleading, or manipulative." The comment to this rule explains that it
prohibits visual or verbal descriptions, depictions, or portrayals in any advertisement which create suspense, or contain exaggerations or appeals to the emotions, call for legal services, or create consumer problems through characterization and dialogue ending with the lawyer solving the problem. Illustrations permitted under Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), are informational and not misleading, and are therefore permissible. As an example, a drawing of a fist, to suggest the lawyer's ability to achieve results, would be barred. Examples of permissible illustrations would include a graphic rendering of the scales of justice to indicate that the advertising attorney practices law, a picture of the lawyer, or a map of the office location.
(Emphasis supplied.) The logo of the pit bull wearing a spiked collar and the prominent display of the phone number 1-800-PIT-BULL are more manipulative and misleading than a drawing of a fist. These advertising devices would suggest to many persons not only that the lawyers can achieve results but also that they engage in a combative style of advocacy. The suggestion is inherently deceptive because there is no way to measure whether the attorneys in fact conduct themselves like pit bulls so as to ascertain whether this logo and phone number convey accurate information.
*245 In addition, the image of a pit bull and the on-screen display of the words "PIT-BULL" as part of the firm's phone number are not objectively relevant to the selection of an attorney. The referee found that the qualities of a pit bull as depicted by the logo are loyalty, persistence, tenacity, and aggressiveness. We consider this a charitable set of associations that ignores the darker side of the qualities often also associated with pit bulls: malevolence, viciousness, and unpredictability. Further, although some may associate pit bulls with loyalty to their owners,[4] the manner in which the pit bull is depicted in the attorneys' ad in this case certainly does not emphasize this association. The dog, which is wearing a spiked collar, directly faces the viewer and is shown alone, with no indication that it is fulfilling its traditional role as "man's best friend."
Pit bulls have a reputation for vicious behavior that is borne of experience. According to a study published in the Journal of the American Veterinary Medical Association in 2000, pit bulls caused the greatest number of dog-bite-related fatalities between 1979 and 1998. Jeffery J. Saks, et al., Breeds of Dogs Involved in Fatal Human Attacks in the United States Between 1979 and 1998, 217 J. Am. Veterinary Med. Ass'n 836, 837 (2000), available at http://www.cdc.gov/ ncipc/duip/dogbreeds.pdf.[5] The dangerousness of pit bulls has also been recognized in a number of court decisions. See, e.g., Giaculli v. Bright, 584 So.2d 187, 189 (Fla. 5th DCA 1991) (recognizing that "[p]it bulls as a breed are known to be extremely aggressive and have been bred as attack animals"); Hearn v. City of Overland Park, 244 Kan. 638, 772 P.2d 758, 768 (1989) ("[P]it bull dogs represent a unique public health hazard not presented by other breeds or mixes of dogs. Pit bull dogs possess both the capacity for extraordinarily savage behavior and physical capabilities in excess of those possessed by many other breeds of dogs. Moreover, this capacity for uniquely vicious attacks is coupled with an unpredictable nature."); Matthews v. Amberwood Assocs. Ltd. Partnership, Inc., 351 Md. 544, 719 A.2d 119, 127 (1998) ("The extreme dangerousness of [the pit bull] breed, as it has evolved today, is well recognized.").
In State v. Peters, 534 So.2d 760 (Fla. 3d DCA 1988), the Third District Court of Appeal upheld a City of North Miami ordinance imposing substantial insurance, registration, and confinement obligations on owners of pit bulls. The City of North Miami ordinance contained findings that pit bulls have a greater propensity to bite humans than all other breeds, are extremely aggressive towards other animals, and have a natural tendency to refuse to terminate an attack once it has begun. *246 See id. at 764.[6] The current Miami-Dade County ordinance provides that it is illegal to own a pit bull. See Miami-Dade County, Fla.Code, § 5-17 (1992).[7]
This Court would not condone an advertisement that stated that a lawyer will get results through combative and vicious tactics that will maim, scar, or harm the opposing party, conduct that would violate our Rules of Professional Conduct. See, e.g., R. Regulating Fla. Bar 4-3.4(g)-(h) (prohibiting threats to present criminal or disciplinary charges solely to gain an advantage in a civil matter). Yet this is precisely the type of unethical and unprofessional conduct that is conveyed by the image of a pit bull and the display of the 1-800-PIT-BULL phone number. We construe the prohibitions on advertising statements that characterize the quality of lawyer services and depictions that are false or misleading to prohibit a lawyer from advertising his or her services by suggesting behavior, conduct, or tactics that are contrary to our Rules of Professional Conduct.
Further, we reject the referee's finding that the use of the words "pit bull" in the phone number is merely a mnemonic device to help potential clients remember the attorneys' number. Phrase-based phone numbers are memorable because of the images and associations they evoke. The "1-800-PIT-BULL" phone number sticks in the memory precisely because of the image of the pit bull also featured in the ad, the association of pit bulls with the characteristics discussed herein, and the "go for the jugular" style of advocacy that some persons attribute to lawyers. In short, this is a manipulative and misleading use of what would otherwise be content-neutral information to create a nefarious association.
Indeed, permitting this type of advertisement would make a mockery of our dedication to promoting public trust and confidence in our system of justice.[8] Prohibiting *247 advertisements such as the one in this case is one step we can take to maintain the dignity of lawyers, as well as the integrity of, and public confidence in, the legal system. Were we to approve the referee's finding, images of sharks, wolves, crocodiles, and piranhas could follow. For the good of the legal profession and the justice system, and consistent with our Rules of Professional Conduct, this type of non-factual advertising cannot be permitted. We therefore conclude that the 1-800-PIT-BULL ad aired by the attorneys violates rules 4-7.2(b)(3) and 4-7.2(b)(4).

B. First Amendment Protection of Lawyer Advertising
We also disagree with the referee's conclusion that the application of rules 4-7.2(b)(3) and 4-7.2(b)(4) to prohibit this advertisement violates the First Amendment. Lawyer advertising enjoys First Amendment protection only to the extent that it provides accurate factual information that can be objectively verified. This thread runs throughout the pertinent United State Supreme Court precedent.
The seminal lawyer advertising case is Bates v. State Bar of Arizona, 433 U.S. 350, 376, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), which involved the advertising of fees for low cost legal services. In Bates, the Supreme Court held generally that attorney advertising "may not be subjected to blanket suppression," and more specifically that attorneys have the constitutional right to advertise their availability and fees for performing routine services. Id. at 383-84, 97 S.Ct. 2691. The cost of legal services, the Supreme Court concluded, would be "relevant information needed to reach an informed decision." Id. at 374, 97 S.Ct. 2691.
In reaching this conclusion the Supreme Court recognized that "[a]dvertising is the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange." Id. at 376, 97 S.Ct. 2691. "[C]ommercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. In short, such speech serves individual and societal interests in assuring informed and reliable decisionmaking." Id. at 364, 97 S.Ct. 2691 (citation omitted).
The Supreme Court emphasized that advertising by lawyers could be regulated and noted that "because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising." Id. at 383, 97 S.Ct. 2691. The Supreme Court specifically declined to address the "peculiar problems associated with advertising claims relating to the quality of legal services," but observed that "[s]uch claims probably are not susceptible of precise measurement or verification and, under some circumstances, might well be deceptive or misleading to the public, or even false." Id. at 366, 97 S.Ct. 2691 (emphasis supplied).
After Bates, the Supreme Court considered a Missouri rule that restricted lawyer advertising to newspapers, periodicals, and the yellow pages, and limited the content of these advertisements to ten categories of information (name, address and telephone number, areas of practice, date and place of birth, schools attended, foreign language ability, office hours, fee for an initial consultation, availability of a schedule of fees, credit arrangements, and the *248 fixed fee charged for specified "routine" services). See In re R.M.J., 455 U.S. 191, 194, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). Even the manner of listing areas of practice was restricted to a prescribed nomenclature. See id. at 194-95, 102 S.Ct. 929. In violation of the state restrictions, the lawyer advertised areas of practice that did not use the prescribed terminology, listed the states in which the lawyer was licensed, specified that he was admitted to practice before the United States Supreme Court, and did not restrict the recipients of announcement cards to lawyers, clients, former clients, personal friends, and relatives. See id. at 198, 102 S.Ct. 929.
Writing for a unanimous Court, Justice Powell summarized the commercial speech doctrine in the context of advertising for professional services:
Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions. Misleading advertising may be prohibited entirely. But the States may not place an absolute prohibition on certain types of potentially misleading information, e.g., a listing of areas of practice, if the information also may be presented in a way that is not deceptive.
Id. at 203, 102 S.Ct. 929. In holding the Missouri restrictions per se invalid as applied to the lawyer, the Supreme Court concluded that the state had no substantial interest in prohibiting a lawyer from identifying the jurisdictions in which he or she was licensed to practice. See id. at 205, 102 S.Ct. 929. The Court noted that this "is factual and highly relevant information." Id. (emphasis supplied). Although the Court found the lawyer's listing in large capital letters that he was a member of the Bar of the Supreme Court of the United States to be "[s]omewhat more troubling" and in "bad taste," this alone could not be prohibited without a finding by the Missouri Supreme Court that "such a statement could be misleading to the general public unfamiliar with the requirements of admission to the Bar of this Court." Id. at 205, 102 S.Ct. 929. In short, the Supreme Court in R.M.J. was dealing with restrictions on clearly factual and relevant information that had not been found to be misleading or likely to deceive. As in Bates, the Supreme Court concluded that such restrictions violated the First Amendment.
In Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 629, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), the Supreme Court addressed whether a state could discipline a lawyer who ran newspaper advertisements containing nondeceptive illustrations and legal advice. One advertisement published the lawyer's willingness to represent women injured from the use of the Dalkon Shield intrauterine device. See id. at 630, 105 S.Ct. 2265. The parties had stipulated that the advertisement was entirely accurate. See id. at 633-34, 105 S.Ct. 2265.
In holding that the lawyer could not be disciplined on the basis of the content of his advertisement, the Supreme Court observed that the advertisement did not promise results or suggest any special expertise but merely conveyed that the lawyer was representing women in Dalkon Shield litigation and was willing to represent other women with similar claims. See id. at 639-40, 105 S.Ct. 2265. Turning to the lawyer's use of an illustration of the Dalkon Shield, the Court first held that illustrations are entitled to the same First Amendment protection as that afforded to *249 verbal commercial speech. See id. at 647, 105 S.Ct. 2265. The Court then concluded that "[b]ecause the illustration for which appellant was disciplined is an accurate representation of the Dalkon Shield and has no features that are likely to deceive, mislead, or confuse the reader, the burden is on the State to present a substantial governmental interest justifying the restriction." Id. at 647, 105 S.Ct. 2265.
The most recent United States Supreme Court decision to address restrictions on the content of lawyer advertising involved an attorney who held himself out as certified by the National Board of Trial Advocacy (NBTA). See Peel v. Attorney Registration & Disciplinary Comm'n of Illinois, 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990). The state supreme court had concluded that the claim of NBTA certification was "misleading because it tacitly attests to the qualifications of [petitioner] as a civil trial advocate." Id. at 98, 110 S.Ct. 2281 (plurality opinion) (quoting In re Peel, 126 Ill.2d 397, 128 Ill.Dec. 535, 534 N.E.2d 980, 984 (1989)) (alteration in original). The state court had not addressed "whether NBTA certification constituted reliable, verifiable evidence of petitioner's experience as a civil trial advocate." Id. at 99, 128 Ill.Dec. 535, 534 N.E.2d 980 (emphasis supplied). After applauding the development of state and national certification programs, a plurality of the Supreme Court concluded that the facts as to NBTA certification were "true and verifiable." Id. at 100, 128 Ill.Dec. 535, 534 N.E.2d 980 (plurality opinion). The plurality pointed out the important "distinction between statements of opinion or quality and statements of objective facts that may support an inference of quality." Id. at 101, 128 Ill.Dec. 535, 534 N.E.2d 980 (plurality opinion) (emphasis supplied). A majority of the Court concluded that the letterhead was not actually or inherently misleading, and thus that the attorney could not be prohibited from holding himself out as a civil trial specialist certified by the NBTA. See id. at 106, 128 Ill.Dec. 535, 534 N.E.2d 980 (plurality opinion); id. at 111-12, 128 Ill.Dec. 535, 534 N.E.2d 980 (Marshall, J., concurring in the judgment).[9]
The pit bull logo and "1-800-PIT-BULL" phone number are in marked contrast to the illustration of the Dalkon Shield intrauterine device at issue in Zauderer, which the United States Supreme Court found to be "an accurate representation ... and ha[ve] no features that are likely to deceive, mislead, or confuse the reader." 471 U.S. at 647, 105 S.Ct. 2265. The Dalkon Shield illustration informed the public that the lawyer represented clients in cases involving this device. The "pit bull" commercial produced by the attorneys in this case contains no indication that they specialize in either dog bite cases generally or in litigation arising from attacks by pit bulls specifically. Consequently, the logo and phone number do not convey objectively relevant information about the attorneys' practice. Instead, the image and words "pit bull" are intended to convey an image about the nature of the lawyers' litigation tactics. We conclude that an advertising device that connotes combativeness and viciousness without providing accurate and objectively verifiable factual information falls outside the protections of the First Amendment.

*250 C. Discipline
Because the referee found that the attorneys were not guilty of violating rules 4-7.2(b)(3) and 4-7.2(b)(4), the referee did not address the issue of discipline. The parties do not address the issue of discipline in their briefs to this Court. However, we have in the past approved public reprimands for attorneys who have been found guilty of violating the advertising rules. See Fla. Bar v. Herrick, 571 So.2d 1303, 1307 (Fla.1990); Fla. Bar v. Budish, 421 So.2d 501, 503 (Fla.1982). We have also required that attorneys attend the Florida Bar Advertising Workshop. See, e.g., Fla. Bar v. Zebersky, 902 So.2d 793 (Fla.2005) (No. SC04-1907) (table report of unpublished order). We conclude that similar discipline is warranted in this case.

CONCLUSION
We disapprove the referee's finding that the television commercial at issue is constitutionally protected speech that does not violate our attorney advertising rules. We find John Robert Pape and Marc Andrew Chandler guilty of violating rules 4-7.2(b)(3) and 4-7.2(b)(4) of the Rules Regulating the Florida Bar. We order that each attorney receive a public reprimand, which shall be administered by the Board of Governors of The Florida Bar upon proper notice to appear. We also direct Pape and Chandler to attend and complete the Florida Bar Advertising Workshop within six months of the date of this opinion.
It is so ordered.
WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] We have jurisdiction. See art. V, § 15, Fla. Const. ("The supreme court shall have exclusive jurisdiction to regulate the admission of persons to the practice of law and the discipline of persons admitted.").
[2] The section of this rule reading "must be objectively relevant to the selection of an attorney and" was eliminated from the rule by amendment on May 20, 2004. See Amendment to Rules Regulating the Fla. Bar, 875 So.2d 448, 453 (Fla.2004). Our opinion did not explain the rationale for the deletion, which was proposed by The Florida Bar. The Bar's petition reflects that the Standing Committee on Advertising proposed the deletion because the language may have been applied more restrictively than was intended, i.e., to prohibit depictions of "the American flag, unless used in the context of federal law, the Statue of Liberty, unless used in the context of immigration, lightning, an eagle, a tool box, and a cactus." Petition to Amend the Rules Regulating the Florida Bar at 18, Amendment to Rules Regulating the Fla. Bar, 875 So.2d 448 (Fla.2004) (No. SC03-705). Because the older version of the rule was in place at the time that the commercial was first broadcast and when the Bar made its complaint, and was the version relied on by the referee in the hearing below, we apply that version here.
[3] Among the definitions of "slogan" are "a brief attention-getting phrase used in advertising or promotion" and "a word or phrase used to express a characteristic position or stand or a goal to be achieved." Merriam-Webster's Collegiate Dictionary 1105 (10th ed.1999).
[4] Even the perception of loyalty may be unwarranted. In June, a twelve-year old boy was mauled to death in San Francisco by his family's two pit bulls. See Jaxon Van Derbeken et al., S.F. Boy, 12, Killed by His Family's Pit Bulls Shocked Inner Sunset Neighbors Call 911 as His Mother Screams: "Help Me!" San Francisco Chron., June 4, 2005, available at http://sfgate.com/ cgi-bin/article.cgi? file=/c/a/2005/06/03/ BAdog maul03.DTL. That same month a Bay Area woman suffered severe injuries in an attack by her nine-year-old pit bull. See Chuck Squatrigha, Woman Mauled by Her Pit Bull, San Francisco Chron., June 7, 2005, available at http://sfgate.com/ cgi-bin/ article.cgi? file=/c/a/2005/06/15 /BApitbull15.DTL. A St. Louis man was killed in May by his two pit bulls that had "no apparent history of aggression and [were] described as well-kept." CBS News.com, Pit Bulls Kill Owner in Home, May 12, 2005, http://www.cbsnews. com/stories/2005/05/12 /national/main694926. shtml.
[5] Of the 238 fatalities accounted for in the study, pit bulls were responsible for 76, or approximately 32 percent. See id.
[6] The findings contained in the ordinance, which were unchallenged, stated:

"WHEREAS, dogs commonly referred to as `Pit Bulls' were for centuries developed and selectively bred for the express purpose of attacking other dogs or other animals such as bulls, bears, or wild hogs; and
"WHEREAS, in developing a dog for this purpose, certain traits were selected and maximized by controlled breeding, including extremely powerful jaws, a high sensitivity to pain, extreme aggressiveness towards other animals, and a natural tendency to refuse to terminate an attack once it has begun; and
"WHEREAS, in addition to statistical evidence that Pit Bull Dogs have a greater propensity to bite humans than all other breeds, there exists overwhelming evidence in the form of individual experiences, that the Pit Bull is infinitely more dangerous once it does attack; and
"WHEREAS, the Pit Bull's massive canine jaws can crush a victim with up to two thousand (2,000) pounds of pressure per square inchthree times that of a German Shepherd or Doberman Pinscher, making the Pit Bull's jaws the strongest of any animal, per pound; and
"WHEREAS, after consideration of the facts, this Council has determined that the following Ordinance is reasonable and necessary for the protection of the public health, safety and welfare."
Id. at 764.
[7] Other jurisdictions have also passed laws banning pit bulls. See TheDenverChannel.com, Pit Bulls Banned Again in Denver, May 9, 2005, http://www.thed enver channel.com/news/446 7849/detail.html; Pam Douglas, New bylaws in effect for pit bulls, more on the way, The Brampton Guardian, Oct. 7, 2005, available at ht tp://www.northpeel .com/br/news/story/ 3081254p-3574295c.html.
[8] The Florida Bar's "Ideals and Goals of Professionalism," adopted by the Bar's Board of Governors in 1990, include the following relevant aspirational guideline:

1.5. When considering whether to advertise and what methods of advertising to use, a lawyer's first goal should be to promote and protect public confidence in a just and fair legal system founded on the rule of law.
[9] In a dissenting opinion joined by Chief Justice Rehnquist and Justice Scalia, Justice O'Connor concluded that the "[f]ailure to accord States considerable latitude in this area embroils this Court in the micromanagement of the State's inherent authority to police the ethical standards of the profession within its borders." Id. at 119, 110 S.Ct. 2281 (O'Connor, J., dissenting).