[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11910

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 17, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00015-CV-J-34TEM

WILLIAM H. HARRELL, JR.,
HARRELL & HARRELL, P.A., et al.,

Plaintiffs-Appellants,

versus

THE FLORIDA BAR, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 17, 2010)

Before EDMONDSON and MARCUS, Circuit Judges, and BARBOUR,* District
Judge.

---

* Honorable William Henry Barbour, Jr., United States District Judge for the Southern
District of Mississippi, sitting by designation.

MARCUS, Circuit Judge:

Plaintiff William H. Harrell, Jr., joined by his law firm Harrell & Harrell and the nonprofit organization Public Citizen, appeals from the district court's grant of summary judgment in favor of defendant The Florida Bar ("the Bar"). Harrell, who advertises the services of his firm extensively, claims in a broad facial challenge that nine advertising-related provisions of the Rules Regulating the Florida Bar ("the rules") are so vague as to violate his due process rights. He also claims in an as-applied challenge that the same rules violate his First Amendment rights by prohibiting him from advertising in a variety of specific ways, including through the use of a slogan -- "Don't settle for less than you deserve" -- that he has included in his advertisements for years. Finally, he challenges as an unconstitutional burden on his speech a requirement that lawyers submit proposed radio and television advertisements to the Florida Bar for review at least twenty days before their dissemination.

The bulk of this case, as it comes to us on appeal, concerns the "[t]hree strands of justiciability doctrine" -- standing, ripeness, and mootness -- that go to the heart of the Article III case or controversy requirement. Socialist Workers Party v. Leahy, 145 F.3d 1240, 1244 (11th Cir. 1998). The district court, in an order of final summary judgment, concluded that all of Harrell's claims except for

his challenge to the twenty-day pre-filing rule were nonjusticiable on one of those three grounds. On the merits of the sole claim it considered justiciable, the district court held that the Bar's pre-filing rule did not violate the First Amendment.

After thorough review, we conclude that Harrell's facial vagueness challenge is justiciable with respect to five of the nine challenged rules. As to all but one of the nine rules, however, we agree with the district court that Harrell's as-applied First Amendment challenge is not ripe, and therefore is nonjusticiable. Turning to the question of Harrell's slogan, we agree with Harrell that his challenge to the Bar's rejection of "Don't settle for less than you deserve" is not moot. Finally, we conclude on the merits that the Florida Bar's twenty-day pre-filing rule is constitutional. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

William Harrell is an attorney in Jacksonville, Florida, and the managing partner of the law firm of Harrell & Harrell, P.A. The firm, which specializes in personal injury law, depends heavily on advertising to generate business, and advertises through a variety of media such as television, radio, billboards, and a website. Like all Florida lawyers, Harrell is subject to the Bar's extensive attorney advertising rules. Those rules, which are found in the Rules Regulating the

3

Florida Bar, apply expansively to a wide range of common advertising content, such as statements of quality, comparisons, background sounds, and other stock advertising techniques. To promote compliance with the rules, Florida lawyers like Harrell must file proposed advertisements with the Florida Bar for a determination of whether the advertisement is permissible. Disseminating a non-compliant advertisement provides grounds for discipline, including public reprimand, suspension, and even disbarment. Rules 3-4.2 & 3-5.1.

The present version of the rules reflects a long and undeniable trend towards increasingly restrictive measures to control attorney advertising. The goal of these measures is to protect the public from misleading advertising and to preserve the reputation of the legal profession in the face of what some perceive as increasingly unscrupulous advertisements. Thus, for example, in 1990, the Florida Supreme Court adopted a range of new rules and explanatory comments that prohibited forms of advertising content such as slogans, jingles, references to past "results obtained," testimonials, statements that "describ[e] or characteriz[e] the quality of the lawyer's services," statements that would be considered true for most lawyers practicing in Florida, statements of comparison like "one of the best" or "one of the most experienced," depictions that "create[] suspense" or contain "exaggerations" or "call[s] for legal services," and "audio or video portrayal[s] of

4

an event or situation." See In re Petition to Amend the Rules Regulating The Fla. Bar, 571 So. 2d 451, 460-64 (Fla. 1990) ("In re 1990 Amendments"). In contrast to the previous set of rules, which had excluded from their purview "[q]uestions of effectiveness and taste," In re Rules Regulating The Fla. Bar, 494 So. 2d 977, 1071-72 (Fla. 1986), the new amendments required that lawyers "provide only useful, factual information presented in a nonsensational manner." In re 1990 Amendments, 571 So. 2d at 464; see also Rule 4-7.1, cmt.

In 1997, again concerned about a loss of public confidence in lawyers and the legal system, the Bar petitioned the Florida Supreme Court for further restrictions. While rejecting a wholesale ban on all television and radio advertising in the state, as advocated by a task force of the Bar, the court amended the rules to place additional prohibitions on "visual and verbal descriptions" or illustrations that are "manipulative" or likely to "confuse" the viewer. In re Amendments to Rules Regulating The Fla. Bar, 762 So. 2d 392, 395-96, 409-10 (Fla. 1999).

In 2004, the Bar proposed still more amendments to the rules, notably including a prohibition on advertisements that "promise[] results," Rule 4-7.2(c)(1)(G), and a rule that appeared to be a pre-screening requirement, pursuant to which a lawyer who sought to air a television or radio advertisement would

have to submit the ad for the Bar's review twenty days <u>prior</u> to the date of airing. <u>See</u> Rule 4-7.7(a)(1)(C). The Florida Supreme Court adopted the Bar's recommendations. <u>In re Amendments to The Rules Regulating The Florida Bar</u>, 971 So. 2d 763, 764-65 (Fla. 2007).

To help attorneys comply with these elaborate rules governing advertising, the Bar provides a three-tiered administrative review structure. An attorney ordinarily must submit a proposed advertisement to the Bar's Ethics and Advertising Department, where a Department staff member issues an advisory opinion. Any adverse opinion of the Department may be appealed to the Standing Committee on Advertising, <u>see</u> Florida Bar Procedures for Issuing Advisory Opinions Relating to Lawyer Advertising or Solicitation ("Procedures") § 4(a), and any adverse decision of the Standing Committee in turn may be appealed to the Board of Governors ("the Board"), which is the chief governing body of The Florida Bar, <u>id.</u> § 4(h). The Board may also review decisions of the Standing Committee <u>sua sponte</u> under limited circumstances. An attorney cannot be disciplined for filing a non-compliant advertisement with the Bar, Tarbert Aff. ¶ 13, and indeed, a favorable determination by the Ethics and Advertising Department or any superior body generally acts as a safe harbor against discipline

on the basis of the advertisement submitted, Rule 4-7.7(a)(1)(F); Rule 4-7.7(a)(2)(F).

Harrell is intimately acquainted with the administrative review process. According to his affidavit, the Bar has over the years repeatedly rejected his firm's advertising submissions for containing elements that he considers harmless, such as an illustration of stick people, a statue of Lady Justice, the scenery outside a window behind him, and a picture of one of his Bar-approved telephone-book advertisements. Harrell Aff. ¶ 5, Sept. 15, 2008.[1] Harrell submits that the Bar's reasons for rejecting his advertisements are often opaque or hyper-technical. Thus, for example, he notes that in rejecting his proposed slogan "You Need an Attorney Fighting for Your Rights," the Bar claimed that the advertisement was misleading because, "[w]hile an attorney can certainly be most helpful to injured individuals, they do not have to have an attorney to bring or settle a civil negligence claim." Id.

Harrell has on four occasions appealed the Ethics and Advertising Department's rejection of his advertisements to the Standing Committee, arguing that the ads were harmless to consumers, and the Bar's restrictions themselves

---

[1] Unless otherwise noted, all references to the "Harrell Affidavit" are to Harrell's second affidavit, filed on September 15, 2008, in support of Harrell's motion for summary judgment.

unconstitutional. Harrell Aff. ¶¶ 6, 14. Each time, the committee affirmed the decision below without addressing his arguments. Harrell Aff. ¶¶ 6, 15. After several appeals to the Board of Governors lasting between seven and nine months each, two of the rejections were eventually reversed. The Board, however, affirmed without explanation the rejection of an advertisement depicting Harrell standing in front of his office building. Harrell Aff. ¶ 7.

Similar vicissitudes ultimately gave rise to this lawsuit, beginning with Harrell's proposed use in 2002 of the advertising slogan "Don't settle for anything less." Around that time, the Bar informed Harrell that the slogan impermissibly "create[d] unjustified expectations about results the lawyer can achieve," in violation of former Rule 4-7.2(b)(1)(B), Harrell Aff. ¶¶ 8-9, but told him that "Don't settle for less than you deserve" was acceptable, id. ¶ 9. The Bar did not explain its reasoning, but Harrell adopted the Bar's proposal and used "Don't settle for less than you deserve" as the centerpiece of the firm's new marketing campaign. Harrell Aff. ¶¶ 9-10. The slogan remains on Harrell & Harrell's website to this day.

Five years after it had authorized the slogan, however, the Bar informed Harrell that "Don't settle for less than you deserve" improperly characterized the quality of his firm's services and therefore was prohibited under Rule 4-7.2(c)(2).

8

Harrell Aff., Ex. 3, at 2. Harrell appealed to the Standing Committee, reminding it that the Bar had itself suggested the slogan several years earlier, but, by letter dated November 28, 2007, the Standing Committee affirmed the decision of the Ethics and Advertising Department, noting that the Committee had previously rejected "Do not settle for anything less" and similar slogans. Harrell Aff. Ex. 5, at 2.

Harrell did not appeal the ruling to the Board of Governors, but instead filed this lawsuit in the United States District Court for the Middle District of Florida on January 7, 2008, seeking a declaratory judgment and injunctive relief. He claimed not only that the Bar's application of Rule 4-7.2(c)(2) to his slogan violated his First Amendment rights, but that <u>nine</u> separate provisions of the Bar's advertising rules imposed unconstitutional content-based restrictions on his commercial speech. He also claimed more broadly that these rules were impermissibly vague and, therefore, facially invalid under the Fourteenth Amendment's due process clause. He objected to the following rules:

-- Rule 4-7.1, a general prefatory rule, the comment to which limits permissible advertising content to "useful, factual information presented in a nonsensational manner";

-- The comment to Rule 4-7.2(c)(1), which bans statements that, "[s]tanding by [themselves,] . . . impl[y] falsely that the lawyer possesses

9

a qualification not common to virtually all lawyers practicing in Florida";

-- Rule 4-7.2(c)(1)(D), which prohibits statements that are "unsubstantiated in fact";

-- Rule 4-7.2(c)(1)(G), which prohibits statements that "promise[] results";

-- Rule 4-7.2(c)(1)(I), which forbids lawyers to "compar[e] [their] services with other lawyers' services, unless the comparison can be factually substantiated";

-- Rule 4-7.2(c)(2), which bans "statements describing or characterizing the quality of the lawyer's services";

-- Rule 4-7.2(c)(3), which prohibits the use of "visual and verbal descriptions, depictions, illustrations, or portrayals of persons, things, or events" that are "manipulative, or likely to confuse the viewer";

-- Rule 4-7.5(b)(1)(A), which similarly prohibits any television or radio advertisement that is "deceptive, misleading, manipulative, or that is likely to confuse the viewer";

-- Rule 4-7.5(b)(1)(C), which prohibits "any background sound other than instrumental music."

Separately, Harrell also claimed that by requiring him to file proposed radio and television advertisements for review twenty days prior to airing them, the Bar had erected an invalid prior restraint on his speech.

In support of his speech and due process claims, Harrell explained at length how a number of advertisements he desired to run appeared to be prohibited by the

10

rules. These proposed ads fall into three general categories: an ad campaign based on the theme of "family"; another campaign based on the theme of "choices" that a prospective client must make in choosing representation; and a loosely defined group of ads in which Harrell intends to feature one or more individual slogans.

Harrell's family-themed advertisements, for example, would have featured Harrell, his family, and his mastiff dogs, and would have "emphasized the family-friendly nature of the firm and its charitable contributions." Harrell Aff. ¶ 28. To humanize the firm, the ads would have shown the firm's facilities, including an "on-site gymnasium established to promote the health of its employees," and would have mentioned the complimentary personal trainers and nutritional counselors available to employees. Id. "Other advertisements in the campaign would have sought to humanize the firm's individual lawyers by telling their personal stories." Id.

Harrell explained, however, that the ads appeared to be prohibited or severely limited by the operation of several of the challenged rules. For one, he claimed that an advertisement focused on the personal narratives and quality of life of a law firm's attorneys would seem to go beyond providing "only useful, factual information presented in a nonsensational manner." Rule 4-7.1, cmt. Separately, with its heavy emphasis on the personality and character of Harrell and

the firm's other attorneys, he argued that the ad might well run afoul of the prohibition on "statements describing or characterizing the quality of the lawyer's services," see Harrell Aff. ¶ 28(c), which the Florida Supreme Court has applied to statements about a lawyer's "character and personality traits," Fla. Bar v. Pape, 918 So. 2d 240, 244 (Fla. 2005).

Harrell also explained how the family-themed advertisements that he proposed arguably would offend Rule 4-7.2(c)(3), which prohibits "visual or verbal descriptions, depictions, illustrations, or portrayals of persons, things, or events that are deceptive, misleading, manipulative, or likely to confuse the viewer." In particular, Harrell's attempt to attract clients by visually depicting his law firm as a "family" may be viewed as "manipulative." Furthermore, as Harrell explains, although his mastiff dogs are in fact "friendly, loyal, and easy-going," Harrell Aff. ¶ 28(b), they also "are popularly known as guard dogs that ferociously defend their territory," id., and therefore might fall within the Florida Supreme Court's determination that the use of aggressive dogs, such as the pit bull, is manipulative, Pape, 918 So. 2d at 244. For these same reasons, Harrell suggested that his ads arguably would violate Rule 4-7.5(b)(1)(A), too, which prohibits in any television or radio ad "any feature that is deceptive, misleading, manipulative, or that is likely to confuse the viewer."

Finally, Harrell said, nearly every aspect of his advertisements plausibly could be deemed "unsubstantiated in fact" in violation of Rule 4-7.2(c)(1)(D), since the notions of a firm being "family friendly" or "like family" are impossible to measure in a fact-bound way. Harrell added that his family-themed advertisements would also contain "background noises caused by [his] dogs, by gym equipment, and by other activities in the firm," Harrell Aff. ¶ 28(d), and therefore almost certainly would violate Rule 4-7.5(b)(1)(C), which prohibits the use in television and radio ads of "any background sound other than instrumental music." Indeed, while the Bar has predictably invoked this rule to prohibit the sound of honking horns, traffic, the sound of squealing breaks, and other potentially inflammatory auditory references to accident scenes, it has also applied the rule to seemingly innocuous sounds such as the "sounds of kids playing with [a] bouncing ball; [the] sound of a computer turning off; [the] sound of a light switch turning off[;] . . . . [the] [s]ound of a seagull in the background[;] . . . [and] [the] [s]ound of a telephone ringing that interrupts an attorney speaking in a television advertisement." Florida Bar, Recent Decisions on Lawyer Advertising, Dec. 15, 2006, First Harrell Aff., Ex. 6, at 7. Given all of these concerns, Harrell abandoned the proposed advertisement, even though he "still wish[es] to develop

13

and run [it], and would do so if not prohibited by the advertising rules." Harrell

Aff. ¶ 28

Harrell's second proposed advertising campaign would have been "based on

the theme of 'choices.'"  Harrell Aff. ¶ 29.  As he described it, the campaign

> would have emphasized that consumers would benefit from the relative
> size and experience of Harrell & Harrell as compared to other firms in
> the market, and that the firm's rates compared favorably to the rates of
> other firms.  The advertisement would have emphasized the firm's
> experience in diverse areas of personal injury practice and the thousands
> of cases in which it has represented consumers.

Id.  Harrell noted, however, that parts of this advertisement would violate the

prohibition of Rule 4-7.2(c)(1)(I) on any communication that "compares the

lawyer's services with other lawyers' services, unless the comparison can be

factually substantiated."  The reason is that Harrell would not be able to

substantiate as a matter of objective fact precisely how his firm's small size and

"experience" would make it superior to other firms.

Third, Harrell claimed that he intended to use a number of slogans in

various advertisements that seemed to be prohibited by the rules.  Thus, for

example, he wanted to run advertisements containing the phrases "I can help," "we

can help," "we fight to win," "we're committed to fight . . . to right those wrongs,"

"you need strong legal representation," and "we help accident victims fight for

14

justice every day." Id. ¶ 21(d), (f). But the Bar has previously applied the rule against statements characterizing the "quality of the lawyer's services," Rule 4-7.2(c)(2), to prohibit even implicit statements of quality, such as "Come and experience the Nation difference" and "When who you choose matters most." See Harrell Aff., Ex. 12, at 14, 36. Since his slogans arguably characterize the quality of his services in the same manner as the prohibited ads, Harrell believed that these past interpretations of the rule by the Bar spelled rejection for his own proposed slogans.

Similarly, Harrell claimed that he wanted to run advertisements containing statements such as "don't give up" and "call Harrell & Harrell." Id. ¶ 21(e). Yet, the Bar has previously applied the rule against statements that "promise[] results," Rule 4-7.2(c)(1)(G), to prohibit implicit or inherently unprovable "promises," such as "Don't let an incident like this one ruin your life" -- implicitly promising that the lawyer can prevent that result -- or "Don't allow the American dream to turn into a nightmare." Harrell Aff., Ex. 12, at 28, 36. Harrell's proposed slogans again appeared to fall within the proscription. Ultimately, Harrell concluded that the rules prohibited all but a "minimalist" campaign consisting of a black background, instrumental music, and images of attorneys speaking. Harrell Aff. ¶ 24.

15

Notwithstanding Harrell's explanations of his proposed advertisements, the Bar moved to dismiss his claims for lack of subject matter jurisdiction, arguing that except as to his as-applied challenge to the rejection of his slogan, Harrell lacked standing because he had not first sought an advisory opinion from the Bar on any of the advertisements he wished to run. For the same reasons, the Bar also claimed that none of Harrell's claims was ripe for review, and, therefore, none was justiciable.

The district court ultimately denied the motion, reasoning that the lack of an advisory opinion did not deprive the court of a justiciable case or controversy because the Bar was free to articulate in court whether it thought that Harrell's proposed ads violated the rules. Separately, however, while the motion to dismiss was pending, Harrell received a letter from the Bar's Ethics Counsel, Elizabeth Tarbert, informing him that the Board of Governors had taken up the matter of his slogan sua sponte and reversed the Standing Committee's judgment that the slogan "Don't settle for less than you deserve" characterized the quality of Harrell's services in violation of Rule 4-7.2(c)(2). Harrell Aff. ¶ 18 & Ex. 7. As a result, when the district court ultimately denied the motion to dismiss, the Bar moved a second time, arguing that the Board's recent decision deprived the court of a live

16

controversy. The district court deferred ruling on that motion while discovery proceeded.

In September 2008, the parties filed cross-motions for summary judgment. In a lengthy opinion, the district court granted summary judgment in the Bar's favor, holding that Harrell's challenge to the rejection of his slogan was moot, that he lacked standing to challenge the application of the nine aforementioned rules, that such a challenge in any event was not ripe, and that, while his attack on the Bar's twenty-day pre-filing rule was justiciable, on the merits that requirement did not violate the First Amendment because, at least as construed by the district court, it did not constitute an illegal prior-restraint on speech.[2] See Harrell v. The Florida Bar, No. 3:08-cv-15-J-34TEM (M.D. Fla. Mar. 30, 2009) (Howard, J.) (Order granting motion for summary judgment, at 24-66) ("Summary Judgment Order"). The district court entered final judgment in the Bar's favor and Harrell filed this timely appeal.

---

[2] Except as to the one issue that the district court addressed on the merits (the constitutionality of the Bar's twenty-day pre-screening rule), we treat the district court's ruling as if it had been made pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. See Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1182 (11th Cir. 2007) ("We have repeatedly said that when a district court disposes of a case on justiciability . . . grounds we will treat the district court's determination as if it was ruling on a motion to dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1), even if the district court mistakenly has labeled its ruling a grant of summary judgment.").

II.

Although the rejection of his slogan ("Don't settle for less than you deserve") may have spurred Harrell to file this lawsuit, the heart of his case is a broad challenge to nine provisions of the Bar's advertising rules on First and Fourteenth Amendment grounds. We begin our discussion with Harrell's Fourteenth Amendment void-for-vagueness challenge, a facial attack in which Harrell claims that all nine rules are "invalid in toto[,] and therefore incapable of any valid application." Steffel v. Thompson, 415 U.S. 452, 474 (1974). Harrell claims effectively that these rules specify "no standard of conduct . . . at all. . . . [and] simply ha[ve] no core." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.7 (1982) (emphasis and citations omitted). Because the district court rejected Harrell's void-for-vagueness claim on standing and ripeness grounds, we limit our review to those two jurisdictional issues. We first take up the issue of standing, which pertains to whether Harrell is a proper plaintiff to raise this void-for-vagueness challenge. See Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 760 n.3 (11th Cir. 1991). We then proceed to the issue of ripeness, which concerns the timing of Harrell's suit. See id.

A.

To demonstrate his standing to bring a vagueness challenge (or any other challenge, for that matter), Harrell must show that: (1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the rules; and (3) a favorable judgment is likely to redress the injury. Kelly v. Harris, 331 F.3d 817, 819-20 (11th Cir. 2003).[3]  Harrell must do so with respect to each Bar rule that he challenges.  See CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1273 (11th Cir. 2006); Falanga v. State Bar of Ga., 150 F.3d 1333, 1335 n.1 (11th Cir. 1998).  Whether Harrell has standing to challenge the Bar rules is a legal issue subject to de novo review.  Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 (11th Cir. 1993).

Under controlling case law, we apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced.  Hallandale, 922 F.2d at 760.  Thus, it is well-established that

> an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.  In such an instance . . . , the injury is self-censorship.

---

[3] Harrell and his law firm are joined in this suit by the nonprofit organization Public Citizen. The district court held that Public Citizen lacked standing to challenge the advertising rules, but the plaintiffs do not challenge that determination here, since only one party need have standing to satisfy the case or controversy requirement. Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006).

Pittman v. Cole, 267 F.3d 1269, 1283 (11th Cir. 2001) (citation omitted).

In challenging the Bar's rules on <u>vagueness</u> grounds, Harrell claims that they powerfully chill his commercial speech, not because they necessarily prohibit the advertisements that he wants to run, but because they give neither him nor any "person of ordinary intelligence a reasonable opportunity to know what is prohibited," and fail to "provide explicit standards for those who apply them." <u>Leib v. Hillsborough County Pub. Transp. Comm'n</u>, 558 F.3d 1301, 1310 (11th Cir. 2009) (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972)). He claims essentially that the rules' broad terms -- terms like "useful," Rule 4-7.1, cmt., "manipulative," or "likely to confuse," Rules 4-7.2(c)(3) & 4-7.5(b)(1)(A) -- "have forced [him] to steer wide of any possible violation lest [he] be unwittingly ensnared." <u>Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves</u>, 601 F.2d 809, 820 (5th Cir. 1979).[4]

In order to substantiate this claimed self-censorship injury, Harrell must establish that: (1) he seriously wishes to advertise his services, <u>Eaves</u>, 601 F.2d at 818; (2) such advertising would arguably be affected by the rules, but the rules are

---

[4] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981.

at least arguably vague as they apply to him, see Wilson v. Taylor, 658 F.2d 1021, 1031 n.17 (5th Cir. Unit B 1981) ("[O]ne may not challenge the vagueness of rules as they might hypothetically be applied to others if one's actions fall squarely within the ambit of the prohibitions."),[5] and (3) there is at least a minimal probability that the rules will be enforced, if they are violated, Eaves, 601 F.2d at 819 n.6. If Harrell can make this threshold showing, he can claim an injury-in-fact to his First Amendment rights that recurs each day and is irreparable, id. at 821, since "it is the existence, not the imposition, of standardless requirements that causes [the] injury." CAMP Legal Defense Fund, Inc., 451 F.3d at 1275.

We conclude that Harrell has satisfied the injury-in-fact requirement with respect to five of the challenged rules: Rules 4-7.2(c)(3), 4-7.5(b)(1)(A), 4-7.2(c)(1)(G), 4-7.2(c)(2), & 4-7.1, cmt. First, Harrell has provided ample proof that he intends to advertise the services of his firm. He is a practicing personal injury lawyer in Florida who has advertised in a variety of media for many years, Harrell Aff. ¶¶ 1-4, and he "depend[s] on advertising for the success of [his] firm," id. ¶ 31, so much so that the firm "could not pull its television ads entirely without facing almost certain bankruptcy," id. ¶ 17. Indeed, by his own account, he

---

[5] This Court has adopted as binding all decisions issued by a Unit B panel of the former Fifth Circuit. Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

"intend[s] to run many more advertisements in the future," and he avers that, were it not for the rules' prohibitions on the use of various advertising techniques, he would use those techniques in his ads, which would make them more effective and professional. Id. ¶¶ 24, 31.

Second, Harrell has made an adequate threshold showing that five of the rules -- those prohibiting advertisements that are "manipulative," Rules 4-7.2(c)(3) & 4-7.5(b)(1)(A), "promise[] results," Rule 4-7.2(c)(1)(G), "characteriz[e] the quality of the lawyer's services," Rule 4-7.2(c)(2), or provide anything other than "useful, factual information," Rule 4-7.1, cmt. -- seem to apply to his proposed advertisements, but fail to provide meaningful standards and thus chill his speech. Harrell makes this threshold showing of vagueness in two ways. With respect to three of the rules -- the rule prohibiting ads that provide anything other than "useful, factual information," Rule 4-7.1, cmt., and the two rules banning advertisements that are "manipulative," Rules 4-7.2(c)(3) & 4-7.5(b)(1)(A) -- Harrell points to ambiguity in the language of the rules itself. Concerning the prohibition on ads that "promise[] results," Rule 4-7.2(c)(1)(G), or "characteriz[e] the quality of the lawyer's services," Rule 4-7.2(c)(2), and again with respect to the ban on "manipulative" ads, Harrell also has gathered examples of inexplicably

22

contradictory advisory rulings by the Bar, and he suggests that these contradictions reveal a measure of arbitrariness in the rules themselves.

Focusing first on textual ambiguity, Harrell points to Rule 4-7.1; although the rule is largely general and prefatory, its accompanying comment indicates that the rule prohibits all but "useful, factual information." At a minimum, Harrell can credibly claim to be confused in determining whether his proposal to advertise the family-like qualities of his firm satisfies this highly subjective requirement. Similarly, Harrell has convincingly explained why the prohibition against "manipulative" radio or television advertisements, see Rule 4-7.5(b)(1)(A); see also Rule 4-7.2(c)(3), reasonably might cause him to "steer wide of any possible violation lest [he] be unwittingly ensnared," Eaves, 601 F.2d at 820: almost every television advertisement employs visual images or depictions that are designed to influence, and thereby "manipulate," the viewer into following a particular course of action, in the most unexceptional sense.

The rule against "manipulative" advertisements leads us to Harrell's second category of evidence, because that rule is also one of several for which Harrell has shown evidence of substantially inconsistent applications by the Bar, in ways potentially suggesting that the rules themselves may be indeterminate and run afoul of the proscription against vagueness. On the subject of manipulation, for

23

example, the Standing Committee held that a close-up image of a tiger's eyes, Harrell Aff., Ex. 12, at 79, and a claim to have the "strength of a lion in court," id., Ex. 12, at 53, were manipulative, whereas the Board held that an image of two panthers was not manipulative. Conversely, the Standing Committee noted that a photograph of a man looking out of a window, representing victims of drunken driving collisions, was not manipulative, id., Ex. 12, at 79, while the Board held that an image of an elderly person looking out of a nursing home window, suggesting nursing home neglect, was manipulative, id., ex. 16, at 5-6. The Ethics and Advertising Department, for its part, said that an image of a fortune teller was "deceptive, misleading, or manipulative," id., ex. 11, at 9-10, and the Standing Committee similarly held that an image of a wizard violated the applicable rule, id., ex. 12, at 17, but the Board ultimately concluded that the image of the wizard was not "deceptive, misleading, or manipulative," id., ex. 12, at 17.

Similarly, in applying Rule 4-7.2(c)(2) against characterizing the quality of the lawyer's services, the Standing Committee held that the phrases "When who you choose matters most" and "MAKE THE RIGHT CHOICE!" violated the rule, id., Ex. 12, at 14; Ex. 14, at 3, but that the phrase "Choosing the right person to guide you through the criminal justice system may be your most important decision. Choose wisely" did not, id., Ex. 15, at 3. The Standing Committee also

24

ruled that the slogan "you need someone who you can turn to, for trust and compassion with this delicate matter" improperly characterized the quality of the lawyer's services, id., Ex. 12, at 51, even though the Standing Committee's Handbook on Lawyer Advertising and Solicitation expressly approves of the slogan "Caring Representation in Family Law Matters. I Want to Help You Through this Difficult Time," Florida Bar, Standing Committee on Advertising, Handbook on Lawyer Advertising and Solicitation, at 4 (6th ed. Mar. 2000, revised May 2004), Harrell Aff., Ex. 8, at 4. And of course, Harrell has already been subject to arguably inconsistent applications of this rule: the Bar rejected his proposed use of the slogan "Don't settle for anything less," suggested without explanation that he use "Don't settle for less than you deserve" instead, but later rejected the latter slogan as an improper characterization of his services.

Next, in applying the rule against statements that "promise[] results," Rule 4-7.2(c)(1)(G), the Standing Committee held that a claim to "fight . . . insurance companies" impermissibly offered such a promise, Harrell Aff., Ex. 12, at 31, but the Board of Governors decided that a claim to "stand up" to insurance companies did not, id., Ex. 12, at 26. The Standing Committee also found that the phrase "let us take care of you" impermissibly promised results, id., Ex. 12, at 40, but wrote in its advertising handbook that the phrase "An Attorney Who Cares For Your

25

Rights!" did not, id., Ex. 8, at 5. The Committee held that the slogan "People make mistakes. I help fix them," promised results, but that "People make mistakes. I help them," did not. Id., Ex. 12, at 2. The Standing Committee further found that the phrase "We'll help you get a positive perspective on your case and get your defense off on the right foot quickly" promised results, id., Ex. 12, at 29, whereas the Board independently determined that there was no such promise in the phrase "If an accident has put your dreams on hold we are here to help you get back on track," id., Ex. 12, at 25. Finally, the Standing Committee ruled that the phrase "your lawyer's knowledge of the law and talents in the courtroom can mean the difference between a criminal conviction and your freedom" violated the rule, id., Ex 12., at 71, but the Board found that the phrase "the lawyer you choose can help make the difference between a substantial award and a meager settlement" did not, id., Ex. 23, at 9-10.

Having considering the text of the five foregoing rules -- Rules 4-7.2(c)(3) & 4-7.5(b)(1)(A) ("manipulative" ads); Rule 4-7.2(c)(1)(G) (ads that "promise[] results"); Rule 4-7.2(c)(2) (ads that "characteriz[e] the quality of the lawyer's services"); Rule 4-7.1, cmt. (ads that contain other than "useful, factual information") -- and the evidence presented by Harrell of their inconsistent application, we are satisfied that Harrell has made an adequate threshold showing

26

of vagueness in the application of the rules to his proposed advertisements, so that he may credibly claim to have suffered an injury-in-fact in the form of self-censorship.

Third, and finally, there can be no doubt that the Bar intends to enforce the rules if it perceives a violation. If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred. See Eaves, 601 F.2d at 821 (explaining that a court can "assume that law enforcement agencies will not disregard . . . a recent expression of the legislature's will"). Here, the Bar revised the rules as recently as 2004, the Florida Supreme Court has on multiple occasions upheld them, see Pape, 918 So. 2d at 244; Fla. Bar v. Gold, 937 So. 2d 652, 656 (Fla. 2006), the Bar is once again defending them in the instant action, and the Bar has explicitly warned Harrell that running impermissible advertisements may subject him to discipline, see Harrell Aff. ¶¶ 13, 15. All of this is sufficient evidence of an intent to enforce the rules.

Under these circumstances, Harrell at least has an arguable claim that the five aforementioned rules are sufficiently vague and indeterminate that he must "steer wide of the danger zone," even if his proposed speech is constitutionally protected. Universal Amusement Co. v. Vance, 587 F.2d 159, 166 (5th Cir. 1978).

27

In other words, it is at least arguable that the rules' alleged vagueness exerts a chilling effect on Harrell's proposed commercial speech, which is enough for Harrell to show an injury-in-fact in the form of self-censorship. And, as for these five rules, Harrell's claims also plainly satisfy the <u>causation</u> and <u>redressability</u> components of the standing inquiry. By definition, Harrell's cognizable self-censorship injury, as we have just described it, is arguably caused by the challenged rules' alleged vagueness. As for the redressability prong, if the challenged rules are stricken as unconstitutional, Harrell simply need not contend with them any longer. Thus, we hold that Harrell has standing to facially challenge Rules 4-7.1, 4-7.2(c)(1)(G), 4-7.2(c)(2), 4-7.2(c)(3), and 4-7.5(b)(1)(A) on vagueness grounds.

As for the remaining four rules, however, Harrell has not shown an injury-in-fact, and he therefore lacks standing to challenge them. Specifically, he has not explained, either textually or by example, how there is any arguable <u>vagueness</u> in the rule prohibiting statements that are "unsubstantiated in fact," Rule 4-7.2(c)(1)(D); in the rule prohibiting any communication that "compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated," Rule 4-7.2(c)(1)(I); in the rule prohibiting "any background sound other than instrumental music," Rule 4-7.5(b)(1)(C); or in the

28

rule against misleading advertisements, to the extent it prohibits a statement that, "[s]tanding by itself[,] . . . implies falsely that the lawyer possesses a qualification not common to virtually all lawyers practicing in Florida," Rule 4-7.2(c)(1), cmt. Just as we will not address a "cursory contention" of vagueness on the merits, Falanga, 150 F.3d at 1335 n.3, we will not merely assume for purposes of standing that these phrases are sufficiently vague to cause Harrell an injury-in-fact in the form of self-censorship. Indeed, we are fairly confident that Harrell can derive the core meaning from these rules, and, absent some indication to the contrary, we hold that Harrell lacks an injury-in-fact flowing from any supposed vagueness in these rules, Wilson, 132 F.3d at 1430, and therefore lacks standing to challenge them broadly on vagueness grounds.

B.

The district court also held that Harrell's vagueness challenge was not ripe. "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997). Again, we apply the doctrine most permissively in the First Amendment context. Beaulieu v. City of Alabaster, 454 F.3d 1219, 1227-28 (11th Cir. 2006); Hallandale, 922 F.2d at 761 n.5 ("[T]he broader the first amendment right and,

29

therefore, the more likely it is that a governmental act will impinge on the first amendment, the more likely it is that the courts will find a justiciable case when confronted with a challenge to the governmental act.").

To determine whether a claim is ripe, we assess both the <u>fitness</u> of the issues for judicial decision and the <u>hardship</u> to the parties of withholding judicial review. <u>Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta</u>, 219 F.3d 1301, 1315 (11th Cir. 2000). The fitness prong is typically concerned with questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." <u>Ernst & Young v. Depositors Econ. Prot. Corp.</u>, 45 F.3d 530, 535 (1st Cir. 1995). The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal. <u>Id.</u>

We fail to discern any ripeness problems concerning Harrell's void-for-vagueness challenge to the five rules that he has standing to challenge. <u>See</u> Rules 4-7.1, 4-7.2(c)(1)(G), 4-7.2(c)(2), 4-7.2(c)(3), and 4-7.5(b)(1)(A). Harrell's claimed injury is immediate. As the former Fifth Circuit said in binding precedent,

> [a]ll vague statutes are unacceptable partly because they encourage . . . arbitrary and discriminatory application; similarly, vague measures regulating first amendment freedoms enable low-level administrative

30

officials to act as censors, deciding for themselves which expressive activities to permit. The very existence of this censorial power, regardless of how or whether it is exercised, is unacceptable.

Eaves, 601 F.2d at 822-23 (citations and quotation marks omitted). For this reason, "it [is] immaterial . . . whether the party challenging the measure even applied for" permission to engage in the challenged conduct. Id. at 823. "[S]ince the very existence of [censorial] power is unacceptable, there is little reason [for a court] to forbear entertaining an anticipatory challenge in order to allow that power to be exercised." Id. It follows that there is no need for Harrell to obtain an opinion from the Bar applying the rules to his proposed advertisements before he may challenge the rules facially on vagueness grounds.

There are several important reasons why a challenge such as the one Harrell has mounted typically will be considered fit for immediate review. For one, the fact that there is even a "credible threat" of enforcement of vague rules -- i.e., "one that is not chimerical, imaginary[,] or speculative," id. at 821 (citations and quotation marks omitted) -- militates in favor of hearing the challenge. Further,

> [s]omething will be gained, but much will be lost if we permit the contours of regulation to be hammered out case by case in a series of enforcement proceedings, as state courts gloss the allegedly vague terms to render them precise, or as the enforcement agencies provide [them] with a patina of less formalized custom and usage. While the "hammering out" continues so do the vices of vagueness; the appellants'

31

> uncertainty about the reach of the ordinance will force them to continue
> to restrict their . . . activities.

Id. at 822 (quotation marks and citations omitted). In other words, the relevant institutional considerations favor immediate review of Harrell's vagueness claims. If the Bar's rules are indeed vague, there is no point in allowing the Bar to issue a series of necessarily arbitrary opinions applying the rules to Harrell's proposed advertisements.

We are left, then, to consider the hardship prong of ripeness. Although "the relationship between the fitness and hardship prongs of the ripeness inquiry is not entirely clear" and raises several "complex issue[s]," Pittman, 267 F.3d at 1280 n.8, it is readily apparent that "[t]he 'hardship' prong . . . is not an independent requirement divorced from the consideration of the institutional interests of the court and agency," AT&T Corp. v. FCC, 349 F.3d 692, 700 (D.C. Cir. 2003), and that "[w]here . . . there are no significant agency or judicial interests militating in favor of delay, [lack of] 'hardship' cannot tip the balance against judicial review," Consol. Rail Corp. v. United States, 896 F.2d 574, 577 (D.C. Cir. 1990) (quotation marks and citation omitted); see also AT&T, 349 F.3d at 700 ("[W]here there are no institutional interests favoring postponement of review, a petitioner need not satisfy the hardship prong."). Accordingly, we need not consider whether Harrell

32

would suffer any hardship if we were to condition judicial review upon his pursuit of some further action, administrative or otherwise.

In sum, we hold that Harrell's vagueness challenges to Rules 4-7.1, 4-7.2(c)(1)(G), 4-7.2(c)(2), 4-7.2(c)(3), and 4-7.5(b)(1)(A) are ripe and therefore justiciable. In so doing, we express no opinion as to the merits of these claims; all we hold today is that Harrell has made a sufficiently credible showing that the rules are unconstitutionally vague on their face; if they are, we decline to let the Bar "hammer[] [them] out case by case" and thereby "provide [them] with a patina" of determinacy. Eaves, 601 F.2d at 822 (citation omitted). The district court should hear these claims now.

### III.

We turn to Harrell's First Amendment claim that the nine challenged rules specifically prohibit advertising conduct that is constitutionally protected. Although Harrell characterizes this challenge as a facial one as well, we are not bound by Harrell's designation of his claims, and we look to the complaint to determine what claims, if any, his allegations support. Jacobs v. The Florida Bar, 50 F.3d 901, 905 n.17 (11th Cir. 1995). We read this challenge to be an as-applied one. While it is "well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even

33

though its application in the case under consideration may be constitutionally unobjectionable," Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 129 (1992) (emphasis added), Harrell "has never raised such a challenge," Opening Br. at 19 n.4. Rather, because he "seek[s] to vindicate [his] own rights, the challenge is as-applied." Jacobs, 50 F.3d at 906 (noting Supreme Court's characterization of challenge as being as-applied when the plaintiff "alleged that but for the prohibition, he would engage in the prohibited behavior" (citation omitted)).

Harrell's as-applied challenge on First Amendment grounds embodies a constitutional theory that is markedly different from his void-for-vagueness challenge, see Rios v. Lane, 812 F.2d 1032, 1039 (7th Cir. 1987) (noting that First Amendment claims and void-for-vagueness due process claims are "completely distinguishable from [one another] and not dependent upon" the same considerations), and it yields a different justiciability calculus. In particular, there are powerful ripeness concerns that flow from Harrell's attempt to challenge the application of the rules' apparent prohibitions to his desired speech, without first having sought an advisory opinion from the Bar. Once again addressing the issues of standing and ripeness in turn, we conclude that while Harrell has standing to

34

challenge all nine of the rules on First Amendment grounds, his challenge is ripe as to only one of the rules.

## A.

As with his vagueness challenge, Harrell claims that the Florida Bar's nine challenged rules cause him an injury-in-fact by chilling his speech, specifically by causing him to engage in self-censorship. Although the analysis differs slightly, we again conclude that Harrell has standing. In the context of his First Amendment claims, where his complaint alleges an actual prohibition rather than the absence of any standard at all, he must show that, as a result of his desired expression, "(1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." Id. (quoting ACLU v. The Florida Bar, 999 F.2d 1486, 1492 (11th Cir. 1993)). Here, he suggests a credible threat of prosecution, which in turn requires that he establish: first, that he seriously wishes to engage in expression that is "at least arguably forbidden by the pertinent law," Hallandale, 922 F.2d at 762; and second, that there is at least some minimal probability that the challenged rules will be enforced if violated, Eaves, 601 F.2d at 818 & n.6.[6]

---

[6] "[T]he probability of enforcement is relevant only to the non-jurisdictional, 'policy considerations' underlying justiciability and not to the existence of a case or controversy." Eaves, 601 F.2d at 818.

Harrell has adequately shown that he would face a credible threat of prosecution if he engaged in the desired speech. <u>First</u>, he has shown a "definite[] and serious[]" desire to engage in certain forms of advertising for his law firm, <u>see</u> <u>Hallandale</u>, 922 F.2d at 762, which depends on advertising for its survival, Harrell Aff. ¶ 31. And, as we explained in our discussion of vagueness, Harrell's affidavit describes a number of advertising campaigns he proposes to develop and run -- including the family-themed campaign, a campaign devoted to comparing the qualities of Harrell & Harrell with the qualities of other law firms, and other campaigns that would feature a variety of specific slogans -- and he explains how the rules "seem[] to proscribe" these advertisements. <u>Graham v. Butterworth</u>, 5 F.3d 496, 499 (11th Cir. 1993). <u>Second</u>, just as with his vagueness challenge, Harrell has shown that there is at least a minimal probability that the Bar will enforce the rules if he is deemed to have violated them. In short, he has demonstrated a cognizable self-censorship injury for purposes of standing.[7]

---

[7] The district court erroneously concluded that Harrell failed to establish any of the three of prongs of standing. First, citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992), the district court concluded that Harrell's claimed injury-in-fact was not sufficiently concrete or imminent because he failed to identify a date on which he proposed to run his desired advertisements. Yet, unlike the vague, "some day" intentions of the wildlife enthusiasts in <u>Lujan</u> to return to Egypt and observe a Nile crocodile, <u>id.</u> at 563-64, Harrell's intense professional dependence on advertising makes it very likely that he will attempt to run advertisements of the kind he describes in his declaration. <u>See Eaves</u>, 601 F.2d at 819. Second, the district court said that Harrell had not established causation because he had never sought the Bar's opinion on his proposed ads, and thus did not know whether the Bar would actually interpret the rules as he expected. Yet Harrell did demonstrate how the challenged rules seem to prohibit the ads he wishes to run, and for purposes

B.

The more difficult hurdle for Harrell's as-applied claims is ripeness. The Bar argues, and the district court agreed, that even if Harrell can demonstrate standing, his claims are still nonjusticiable -- and specifically not ripe -- because he has never sought an advisory opinion from the Bar. After assessing the fitness of the issues for judicial decision and the hardship to Harrell of withholding judicial review, Coal. for the Abolition of Marijuana Prohibition, 219 F.3d at 1315, we agree, with one exception, that Harrell's claims are not ripe.

A plaintiff who demonstrates standing by showing that he faces a "credible threat of prosecution" if he engages in certain speech often will succeed in showing that his claims are ripe as well, since the law generally will not force a choice between speech and sanction. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). In the present case, however, although the appearance that the rules would prohibit Harrell's desired advertisements

---

of standing, we needn't know for certain how the rules will be applied to fairly conclude that they chill Harrell's speech. Finally, the district court held that Harrell's claimed injuries appeared not to be redressable because Harrell had "failed to demonstrate that [his] proposed advertisements complied with all of the other advertising rules, which have not been challenged in this action." Summary Judgment Order, at 50. Redressability is established, however, when a favorable decision "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered," Utah v. Evans, 536 U.S. 452, 464 (2002), and here, it is likely that if the challenged rules are held unconstitutional, Harrell will be allowed to run many or all of the advertising campaigns he has outlined in his affidavit, at least in a form far closer to what he envisions than the "minimalist" campaign he has run thus far. Harrell Aff. ¶ 24.

37

unquestionably has <u>some</u> chilling effect -- one sufficient to constitute an injury-in-fact for purposes of standing -- the Florida Bar undeniably provides an advisory opinion process, so that an attorney like Harrell is actually "in no danger of being disciplined without having an opportunity to determine in advance whether [his] proposed advertisements are lawful." <u>Felmeister v. Office of Attorney Ethics</u>, 856 F.2d 529, 538 (3d Cir. 1988). Indeed, a favorable determination by the Ethics and Advertising Department, the Standing Committee, or the Board of Governors generally acts as a safe harbor against discipline on the basis of an approved advertisement. And, if "[Harrell's] proposed advertisements [were to] meet with the [Bar's] approval, . . . there would indeed be no case or controversy to adjudicate." <u>Id.</u> at 537. In other words, although Harrell is a "party [who] can appropriately bring suit," the fact that an opinion from the Bar could lend significantly more concreteness to his as-applied claims, while allowing the Bar to perform its interpretive role, fairly raises issues regarding the "timing of the suit." <u>Elend v. Basham</u>, 471 F.3d 1199, 1205 (11th Cir. 2006) (explaining distinction between standing, which goes to identity of parties, and ripeness, which goes to timing).

Given the distinct possibility in such situations that agency review will eliminate the need for judicial review, and given the role of the ripeness doctrine

in "protect[ing] . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," Pittman, 267 F.3d at 1278 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) (footnote omitted)); see also Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 732-33 (1998), we may require that First Amendment plaintiffs seek determinations with varying degrees of finality from agencies whose rules or decisions they seek to challenge on an as-applied basis. See, e.g., Nat'l Adver. Co. v. City of Miami, 402 F.3d 1335, 1339 (11th Cir. 2005); Pittman, 267 F.3d at 1277-78; Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 590-91 (11th Cir. 1997); Felmeister, 856 F.2d at 531. This requirement, which goes to the question of fitness for judicial review, is not a form of administrative exhaustion, but rather a requirement that "an administrative action must be final before it is judicially reviewable." Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1574 n.8 (11th Cir. 1989) (quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 192 (1985)).

We have recognized an exception to this requirement in cases where there is nothing to be gained from an agency's interpretation of a rule because the rule's application is clear on its face. Thus, in Jacobs v. The Florida Bar, we explained

that where, under the challenged rules, "advertising methodologies are prohibited in their entirety, the court would not benefit from [the plaintiffs'] production of" an advertisement employing that methodology. 50 F.3d 901, 906 n.18 (11th Cir. 1995). "[S]uch an advertisement violates the rules regardless of the content precisely because of the method through which the message is communicated." Id. Since few, if any, institutional interests would be served by asking an agency to interpret a rule whose application is utterly clear, the absence of an agency opinion ordinarily will not affect whether a challenge to such a rule is fit for immediate judicial review.

Applying these general principles, we divide Harrell's First Amendment as-applied claims into two general categories to assess their fitness for review (and, ultimately, their ripeness): those claims that challenge a rule whose application is categorical and thus clear; and those that challenge a rule whose application leaves substantial room for reasonable interpretation by the Florida Bar.

We can discern only one rule that falls into the first category. That is the rule prohibiting "any background sound other than instrumental music." Rule 4-7.5(b)(1)(C). If there is any ambiguity in what constitutes a "background sound" or "instrumental music," that ambiguity is de minimis. Plainly, the district court would not benefit from Harrell's production of an otherwise permissible

40

advertisement that contained the sounds of his mastiff dogs or his law firm's gym equipment, or from an opinion of the Bar inevitably holding that those sounds constitute background sounds and not instrumental music, and are therefore impermissible. Thus, we consider Harrell's as-applied First Amendment challenge to this rule fit for review. And, because "there are no significant agency or judicial interests militating in favor of delay," we need not consider whether requiring Harrell to pursue any of the several available options for administrative review would constitute a hardship." Consol. Rail Corp., 896 F.2d at 577.

The remaining eight rules, however, are not so clear in their application as to obviate the need for interpretation by the Bar. Indeed, Harrell's case for vagueness undermines any such suggestion, and the lack of any opinion from the Bar raises serious fitness concerns. In assessing the fitness of these remaining claims, we are guided by our decision in Pittman v. Cole, 267 F.3d 1269 (11th Cir. 2001), where we addressed the ripeness of claims by Alabama state judicial candidates that the State Bar of Alabama's Canons of Judicial Ethics violated their First Amendment rights by preventing them from completing a judicial questionnaire. Concerned initially that the Canons might apply to the questionnaire, the plaintiffs obtained an informal opinion from the State Bar, in

41

which the Bar advised them that responding to some of the questions would violate the Canons. Id. at 1274-75.

The plaintiffs did not, however, avail themselves of the Bar's administrative procedure for obtaining a formal, official advisory opinion from the Disciplinary Commission, which was the only arm of the Bar whose decisions on ethical matters were binding for enforcement purposes. Id. at 1275. Instead, the plaintiffs filed an action in federal court. A panel of this Court held that because the plaintiffs had failed to utilize the available formal review procedure and obtain a final opinion concerning the Bar's policy on the questionnaire, they were impermissibly "ask[ing] the district court and now this Court to speculate, without any evidentiary basis, that the Bar's Disciplinary Commission would agree with the general counsel's [informal] opinion concerning the application of the Canons of Judicial Ethics to candidates responding to the . . . questionnaire." Id. at 1280.

In reaching that conclusion, the Court explained that although the issue of whether the rules prohibited certain conduct -- specifically, answering the questionnaire -- appeared to be a purely legal question, "an important factual issue [had] initially [to] be resolved[,] [namely] what the actual policy of the Bar [was] concerning the questionnaire." Id. at 1278. Because an informal opinion did "not establish the Bar's policy" when higher levels of administrative review were

available, id. at 1278-79, "the unresolved, fundamental factual issue of what the Bar's official position [was] in regard to the questionnaire counsel[ed] strongly against finding ripeness," id. at 1279.  Relatedly, we explained that allowing the Bar to "crystallize its policies without undue interference from the federal courts is a good thing," which "also weigh[ed] strongly in favor of the conclusion that the plaintiffs' claims against the Bar [were] premature."  Id.

Pittman teaches that where the application of certain challenged rules is less than obvious, and the plaintiff has a ready means of determining how they will be applied, there are "strong interests militating in favor of postponement."  AT&T Corp. v. FCC, 349 F.3d 692, 700 (D.C. Cir. 2003).  The reason is simple: it would necessarily be speculative to assume that the Bar actually will apply the rules as Harrell believes.  It is true that Harrell has attempted to reduce the degree of speculation by providing evidence of how the Bar has previously interpreted several of the rules in the context of similar advertisements.  Yet, helpful as this information may be, it is no substitute for an opinion from the Bar, since the challenged rules by and large do not contain categorical prohibitions that would obviate the need for the Bar to interpret them.  Thus, for example, although Harrell's family-themed advertisements arguably may violate the prohibition on all but "useful, factual information," Rule 4-7.1, cmt., the ban on statements

43

"characterizing the quality of the lawyer's services," Rule 4-7.2(c)(2), or the rule against "visual or verbal . . . depictions . . . that are . . . manipulative," Rule 4-7.2(c)(3), it is altogether conceivable that the Bar would not interpret these rules to apply to Harrell's advertisements.

As in Pittman, there remains a substantial measure of uncertainty about the "fundamental factual issue" of how the Bar will apply the rules to the proposed advertisements. Pittman, 267 F.3d at 1279. At the same time, and equally important, the Florida Bar, through the Ethics and Advertising Department, has provided a relatively "expeditious means of testing the reach of the rule through an advisory opinion process," Felmeister, 856 F.2d at 531, for which even a script or outline of a proposed advertisement will suffice. See Rule 4-7.7(a)(1)(B). Harrell, however, has not even submitted a bare script of his proposed advertisements to the Ethics and Advertising Department, "and hence ha[s] not availed [himself] of a relatively simple way of determining whether [his] ads run afoul of the rule[s]." Felmeister, 856 F.2d at 531. Quite simply, his as-applied claims raise serious fitness concerns.[8]

---

[8] For purposes of ripeness, the relevance of an opinion from the Bar differs when we consider Harrell's as-applied challenge, rather than the facial one. As for his facial due process challenge, Harrell has shown that five rules are at least arguably vague, and if he is right -- if the rules actually "ha[ve] no core," Village of Hoffman Estates, 455 U.S. at 495 n.7 -- there is no point in allowing the Bar to issue a series of necessarily arbitrary opinions applying them to Harrell's proposed advertisements. By contrast, Harrell argues through his First Amendment claim that the rules

44

Turning to the related question of hardship, Harrell has not given us any substantial reason to believe that submitting a bare script or outline of the advertisements he proposes would constitute a hardship. While he asserts in his reply brief, at the highest order of abstraction, that "even the process of developing ideas, concepts, and scripts is expensive," Reply Br. at 11, an unsupported general assertion in a brief provides precious little basis for finding hardship. Harrell also urges that an opinion based on a script would add nothing to the ripeness inquiry because it would not be conclusive and binding on the Bar. We are unpersuaded. Such an opinion obviously would provide a concrete indication of whether the Bar is likely to approve or reject Harrell's proposed advertisements.[9] Given the

affirmatively prohibit certain conduct. In that context, it is very important to know whether the rules really do prohibit the desired conduct. Thus, this type of as-applied challenge is most likely to be ripe if the rules clearly apply on their face, or if the enforcing authority -- here, the Bar -- has told us that they apply.

Ultimately, we recognize that there is a measure of tension between Harrell's two constitutional theories -- one claiming that the rules lack a meaningful standard, the other claiming that they plainly and specifically prohibit what he wishes to do. Harrell is entitled to pursue both of these theories, but he is obligated to establish the justiciability of each of his claims.

[9] To this last point, Harrell responds that many appeals to the Bar's higher-level review bodies result in reversal, indicating that an opinion by one of the Bar's inferior bodies would be unreliable to the point of uselessness. Harrell notes, for example, that nearly twenty percent of appeals to the Standing Committee, and nearly fifty percent of appeals to the Board of Governors, result in at least a partial reversal. Reply Br. at 17 (citing Tarbert Aff. ¶¶ 5, 9 & 10). Harrell has not mentioned, however, that the Ethics and Advertising Department has issued over fifty thousand opinions since 1994, and that only three percent of those were appealed at all. Tarbert Aff. ¶ 9. Similarly, only slightly more than one-half of one percent of all opinions issued by the Ethics and Advertising Department were appealed to the Board. Id. ¶ 10. Given the various possible explanation for these statistics -- it may be, for example, that only arguably incorrect opinions are appealed at all -- we are thoroughly unconvinced that the administrative reversal rate demonstrates

45

serious fitness concerns raised by Harrell's claims, we think that at a bare minimum, Harrell had an obligation to obtain an opinion "from someone 'with the knowledge and authority to speak for the [Bar].'" See Am. Charities, 221 F.3d at 1215 (citation omitted). His unexcused failure to do so means that his challenges to all but Rule 4-7.5(b)(1)(C) concerning background noise are not now ripe for judicial review.[10] Accordingly, the district court properly rejected them as nonjusticiable.

IV.

The final justiciability question raised by this appeal concerns Harrell's specific challenge to the Bar's rejection of his slogan "Don't settle for less than you deserve." The Bar claims that the challenge has become moot because the Board of Governors has now declared that the slogan is permissible, at least as used in the advertisements that Harrell originally submitted for review. On the other hand, Harrell says that the Board cannot be trusted to maintain its new-found

---

any "inherent unreliability [in] the Bar's own review process." Reply Br. at 17.

[10] We express no opinion about whether, to make his claims ripe, Harrell must submit a finalized advertisement to the Bar for review or take an appeal of any adverse decision as far as the Board of Governors. We recognize that to produce a finalized television advertisement might cost Harrell tens of thousands of dollars, and that appealing an adverse ruling to the Board might take upwards of a year -- both of which might qualify as the type of "practical" hardship that is relevant to the ripeness inquiry. Pittman, 267 F.3d at 1281. We do not weigh that hardship in the balance today, however, because the only question we face is whether Harrell's claims are ripe as presently presented.

46

solicitude for his slogan because, among other things, the Board failed to act until after the lawsuit was filed, made its decision in a secretive and irregular manner without ever disclosing its reasoning, and has given no assurances in the instant proceedings that it will not later change its mind. The Bar, for its part, characterizes the Board's actions as an honest and unremarkable effort to correct an erroneous judgment by the Standing Committee, and says that as a governmental actor, it is entitled to rely on a presumption that it will not resume the challenged conduct.

"[A] federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)). By the same token, however, "[i]t has long been the rule that 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.'" Nat'l Adver. Co. v. City of Miami, 402 F.3d 1329, 1333 (11th Cir. 2005); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000). Since the defendant is "free to return to his old ways," United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953), he bears a "heavy burden" of demonstrating that his

cessation of the challenged conduct renders the controversy moot, Laidlaw, 528 U.S. at 189 (citation omitted). That burden will have been borne only if:

> (1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, and

> (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

Los Angeles County v. Davis, 440 U.S. 625, 631 (1979) (citations omitted). In other words, when a party abandons a challenged practice freely, the case will be moot only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1131 (11th Cir. 2005) (emphasis added) (quoting Laidlaw, 528 U.S. at 189).

"[I]n general, the repeal of a challenged statute is one of those events that makes it absolutely clear that the allegedly wrongful behavior . . . could not reasonably be expected to recur." Coral Springs Street Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1331 n.9 (11th Cir. 2004) (citation and quotation marks omitted). Even short of so weighty a legislative act, we have applied a "rebuttable presumption" in favor of governmental actors, so that "a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the

48

suit is terminated." Troiano v. Supervisor of Elections in Palm Beach County, 382 F.3d 1276, 1283-85 (11th Cir. 2004); see also Coral Springs, 371 F.3d at 1328-29 ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988) ( "[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.").

Conversely, where the circumstances surrounding the cessation suggest that the defendant is "attempting to manipulate the [c]ourt's jurisdiction to insulate a favorable decision from review," City of Erie v. Pap's A.M., 529 U.S. 277, 288 (2000), courts will not deem a controversy moot. Nat'l Adver. Co., 402 F.3d at 1333 ("[V]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction."). More generally, the "timing and content" of a voluntary decision to cease a challenged activity are critical in determining the motive for the cessation and therefore "whether there is [any] reasonable expectation . . . that the alleged violation will recur." Burns v. Pa. Dep't of Corr., 544 F.3d 279, 284 (3d Cir. 2008) (internal citation and quotation marks omitted).

As for timing, a defendant's cessation before receiving notice of a legal challenge weighs in favor of mootness, Troiano, 382 F.3d at 1285, while cessation that occurs "late in the game" will make a court "more skeptical of voluntary changes that have been made." Burns, 544 F.3d at 284. With respect to content, we look for a well-reasoned justification for the cessation as evidence that the ceasing party intends to hold steady in its revised (and presumably unobjectionable) course. See Troiano, 382 F.3d at 1285 (finding challenge moot where governmental defendant ceased challenged behavior on a "well reasoned" basis); Christian Coal. of Ala. v. Cole, 355 F.3d 1288, 1292 (11th Cir. 2004) (holding that challenge to application of state judicial canons to certain conduct was moot where governmental defendant represented to court that it would not file charges against the plaintiffs on the basis of recent Supreme Court precedent); Ragsdale, 841 F.2d at 1365-66 (finding one challenge moot where governmental defendant voluntarily ceased conduct because "enforcement [was] barred by clear Supreme Court precedent," but finding second challenge not moot because cessation was based on district court decision that did not squarely enjoin the challenged practice).

Similarly, the timing and content of the decision are also relevant in assessing whether the defendant's "termination" of the challenged conduct is

sufficiently "unambiguous" to warrant application of the Troiano presumption in favor of governmental entities. Cf. Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1333-34 (Fed. Cir. 2005) (holding that Troiano presumption "d[id] not apply" because, inter alia, "the government ha[d] not provided sufficient evidence that the allegedly offending conduct w[ould] not recur"). Short of repealing a statute, if a governmental entity decides in a clandestine or irregular manner to cease a challenged behavior, it can hardly be said that its "termination" of the behavior is unambiguous.

Applying these principles, we agree with Harrell that his challenge to the Bar's rejection of his slogan is not moot. While we are generally disposed to credit the Bar's characterization of the Board's actions as a straightforward intervention in the advisory opinion process to correct several incorrect and possibly self-contradictory opinions of the Bar's inferior review bodies, we cannot do so here because the record neither yields absolute certainty that the challenged conduct has permanently ceased, nor, when one considers the "timing and content" of the Board's decision, supports the conclusion that the Board's policy was "unambiguously terminated," as required to invoke the governmental actor presumption.

First of all, the Board acted in secrecy, meeting behind closed doors and, notably, failing to disclose any basis for its decision. As a result, we have no idea whether the Board's decision was "well-reasoned" and therefore likely to endure. Cf. Troiano, 382 F.3d at 1285; Cole, 355 F.3d at 1292-93; Ragsdale, 841 F.2d at 1365-66. In fact, the Board's decision might reflect a range of possible judgments, and some of them would not warrant a finding of mootness. In ACLU v. The Florida Bar, 999 F.2d 1486 (11th Cir. 1993), for example, we applied the voluntary cessation exception to a plaintiff's challenge to certain of the Bar's rules even though the Bar had "acquiesced in [the plaintiff's] position." Id. at 1490. We did so because, although the Bar had agreed that it would not enforce the rule against the plaintiff in that particular instance, it still maintained that the challenged rule was constitutional and that the plaintiff's conduct fell within it. See ACLU, 999 F.2d at 1494-95. In this case, the Bar's opaque decision fairly leaves open the possibility that, just as in ACLU, the Board agrees with the Standing Committee but has decided that it will not enforce the rule against Harrell in this case. Id.; see also Graham, 5 F.3d at 500 (interpreting ACLU, 999 F.2d at 1494). Such a course by the Bar would not suffice to moot the instant controversy.

In fact, the circumstances here raise a substantial possibility that "the defendant has . . . changed course simply to deprive the court of jurisdiction," which itself prevents us from finding the controversy moot. Nat'l Adver. Co., 402 F.3d at 1333. The record reveals that the Board took up the matter of Harrell's advertisements only at the urging of the Bar's counsel after this litigation had commenced, see Hr'g Tr. 85, Jan. 6, 2009, and that in doing so, it may have departed from its own procedures. Specifically, the Bar's own rules provide for review by the Board in only two instances: first, where an attorney objects to the Standing Committee's decision; and second, upon the Board's own initiative if the Board "determines that the application of the attorney advertising rules to a particular set of facts is likely to be of widespread interest or unusual importance to a significant number of Florida Bar members." Florida Bar Procedures for Issuing Advisory Opinions Relating to Lawyer Advertising or Solicitation § 2(c)(2). Harrell did not seek review by the Board, and the Bar has not suggested that the application of Rule 4-7.2(c)(2) to Harrell's particular slogan, among many presumably similar permutations, would be "of widespread interest or unusual importance" to a significant number of Florida Bar members.

For the same reasons, we are unable to say that the Board, through its decision, "unambiguously terminated" the challenged application of Rule

53

4-7.2(c)(2) to Harrell's slogan, as required to invoke the presumption we identified in Troiano. Perhaps the Board believes with the firmest conviction that the Standing Committee's decision was wrong, but then again, perhaps the Board actually agrees with the Standing Committee and has merely decided "not [to] enforce [the Rule] against [Harrell] in this case." Graham, 5 F.3d at 500 (interpreting ACLU, 999 F.2d at 1494). In fact, the Board's "termination" of the standing committee's decision is very much clouded by ambiguity. As a result, we cannot apply the governmental presumption recognized in Troiano. In other words, the Bar has not borne its heavy burden of showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Alabama v. Corps of Eng'rs, 424 F.3d at 1131 (emphasis added) (quoting Laidlaw, 528 U.S. at 189). Thus, we hold that Harrell's challenge to the rejection of his slogan "Don't settle for less than you deserve" is not moot.

## V.

Harrell's final challenge -- and the only one that we have occasion to review on the merits -- is to the Bar's requirement that a lawyer submit any television or radio advertisement for review at least twenty days before its first planned dissemination or airing date, giving the Bar approximately fifteen days in which to review the ad and five days for mail transit time. See Rule 4-7.7(a)(1)(A). The

54

rule states that during the fifteen-day review period, the Bar "shall" review the advertisement and notify the submitting lawyer whether it complies with the advertising rules, Rule 4-7.7(a)(1)(C), and that the lawyer may disseminate the advertisement "upon receipt of notification by The Florida Bar that the advertisement complies with subchapter 4-7." Rule 4-7.7(a)(1)(E).

Harrell argued in the district court that the rule was an unconstitutional prior restraint under the First Amendment. The district court considered the claim justiciable, and in defending the rule on the merits, the Bar urged a construction of the rule under which a lawyer may disseminate a proposed advertisement upon receipt of <u>any</u> opinion by the Bar, rather than, as the text of the rule might suggest, only upon receipt of a <u>favorable</u> opinion. The district court accepted this narrowing construction, and, having thus construed the rule as a "pre-filing" rather than a "pre-clearance" requirement, it rejected Harrell's challenge to the rule as a prior restraint.

In this appeal, Harrell accepts the district court's construction of Rule 4-7.7(a)(1); he assumes, as do we, that the Bar is bound by its representations in the district court and will not attempt to enforce the rule as a prior restraint on speech. Nevertheless, Harrell argues that the pre-filing rule, even if not a prior restraint, is an imposition on commercial speech and, therefore, must be analyzed

under the general test laid out in <u>Central Hudson Gas & Electric Corp. v. Public Service Commission of New York</u>, 447 U.S. 557 (1980). We agree with Harrell that a <u>Central Hudson</u> analysis is required, but we still can see no constitutional violation.

"Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618, 623 (1995) (quotation marks, brackets, and citations omitted). Indeed,

> [s]ince advertising is the Sine qua non of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely. Attributes such as these, the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker[,] . . . [and] may also make inapplicable the prohibition against prior restraints.

<u>Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.</u>, 425 U.S. 748, 771 n.24 (1976).

As a result, the Supreme Court has strongly suggested that the type of mandatory pre-distribution review of commercial speech imposed by Rule 4-7.7(a)(1) is constitutional. Thus, for example, the Court noted in <u>Central Hudson</u> itself that because traditional prior restraint principles may not fully apply to

56

commercial speech, a state may require "a system of previewing advertising campaigns to insure that they will not defeat" state restrictions. Cent. Hudson, 447 U.S. at 571 n.13. Similarly, in striking down a "total ban" on direct-mail solicitations by lawyers, the Supreme Court opined that

> [t]he State can regulate . . . abuses and minimize mistakes through far less restrictive and more precise means, the most obvious of which is to require the lawyer to file any solicitation letter with a state agency, giving the State ample opportunity to supervise mailings and penalize actual abuses.

Shapero v. Ky. Bar Ass'n, 486 U.S. 466, 476 (1988) (internal citations omitted); see also Felmeister, 856 F.2d at 536 (recognizing Supreme Court's "repeated[] suggest[ions] that in the area of commercial speech, prescreening or prepublication review of advertisements may be constitutionally sound").

If these unequivocal dicta in Central Hudson and Shapero were binding on us, it would follow a fortiori that the less intrusive "pre-filing" system imposed by Rule 4-7(a)(1)(A) is permissible. Although the aforementioned dicta do not alone make Rule 4-7.7(a)(1) constitutional, it is no surprise that the rule passes muster under Central Hudson.

Under the "intermediate scrutiny" standard governing the regulation of non-deceptive commercial speech set forth in Central Hudson, we ask whether an imposition on commercial speech (1) promotes a substantial governmental

interest; (2) directly advances the interest asserted; and (3) is not more extensive than necessary to serve that interest. Cent. Hudson, 447 U.S. at 564; see also Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 638 (1985).

"Unlike rational basis review, the Central Hudson standard does not permit us to supplant the precise interests put forward by the State with other suppositions." Went For It, 515 U.S. at 624 (quoting Edenfield v. Fane, 507 U.S. 761, 768 (1993)). The Florida Bar asserts a number of interests in regulating attorney advertisement that the Supreme Court has recognized as "substantial" for purposes of Central Hudson. For one, the Bar has a "paramount . . . objective of curbing activities that 'negatively affec[t] the administration of justice.'" Id. (quoting In re 1990 Amendments, 571 So. 2d at 455). Specifically, the Bar has an interest in preventing "reputational harm to the profession," id. at 630, and in "preserv[ing] [its] integrity," id. at 624 (quoting McHenry v. The Florida Bar, 21 F.3d 1038, 1043 (11th Cir. 1994)). Thus, in Went For It, the Supreme Court recognized the Bar's interest in maintaining a rule designed to "protect the flagging reputations of Florida lawyers by preventing them from engaging in conduct that . . . is universally regarded as deplorable and beneath common decency." Id. at 625 (quotation marks and citation omitted). Beyond these general interests of the Bar in regulating attorney advertising, the Supreme Court

has recognized that "the special problems of advertising on the electronic broadcast media will warrant special consideration." Bates v. State Bar of Ariz., 433 U.S. 350, 384 (1977). See also FCC v. Pacifica Found., 438 U.S. 726, 748 (1978) ("[T]he broadcast media have established a uniquely pervasive presence in the lives of all Americans.").

Under the second prong of Central Hudson, the Bar must "demonstrate that the challenged regulation advances [its asserted] interest[s] in a direct and material way." Went For It, 515 U.S. at 625-26 (quotation marks and citation omitted). "That burden . . . is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the . . . . rule at issue . . . targets a concrete, nonspeculative harm." Id. at 626, 629. We have no difficulty concluding that Rule 4-7.7(a)(1), as construed and limited by the district court, directly advances the Bar's substantial interests in curbing practices that negatively impact the administration of justice, protect the public from abusive practices, and preserve the reputation and integrity of the legal profession.

Under the Florida Bar's previous compliance regime, a lawyer was not required to submit a television or radio advertisement for review until he filed it. See In re Amendments to the Rules Regulating The Fla. Bar, 971 So. 2d 763, 784

59

(Fla. 2007). But a review of advertisements filed with the Bar revealed that nearly half of all television and radio advertisements in the years leading up to the revised regime had been found not to comply with the Rules. See Florida Bar, Petition to Amend the Rules Regulating the Florida Bar -- Advertising Rules, filed Dec. 14, 2005, Harrell Aff., Ex. 9, at 14. In some years, the rate of non-compliance was as high as 60%. Id. Requiring lawyers to give the Bar a brief opportunity to advise them of whether their advertisements are compliant serves the rule's expressly stated purposes, namely, "to enhance . . . the bar's ability to monitor advertising practices for the protection of the public and to assist members of the bar to conform their advertisements to the requirements of these rules." Rule 4-7.7, cmt. In other words, the rule helps reduce the number of non-compliant advertisements by giving lawyers the opportunity to comply voluntarily with the Bar's view of the rules. That, in turn, serves to minimize the number of advertisements that would, in the Bar's view, harm the public or its perception of the legal system as a whole.[11]

---

[11] Harrell's principal explanation of why the pre-filing requirement fails to advance any legitimate state interest is no more than a veiled attack on the substance of the advertising rules themselves. Mainly, Harrell says that noncompliance with the rules is rampant precisely because the rules are vague and insusceptible of enforcement in a consistent and principled manner, and that for this reason, the Bar's guidance is useless anyway. This argument is properly the subject of Harrell's vagueness challenge, but it is not relevant to our present inquiry under Central Hudson. Harrell does not challenge every extant rule of the Florida Bar, and our task is only to decide whether the procedure that the Bar has chosen to ensure compliance with its rules places an unacceptable

The third prong of <u>Central Hudson</u> requires that there be an adequate "fit between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable." <u>Went For It</u>, 515 U.S. at 632 (quotation marks and citation omitted). In other words, the regulation must be "reasonably well tailored to its stated objective." <u>Id.</u> at 633. The plaintiffs in this case have neither suggested a less restrictive means of effectuating the Bar's important goals, nor explained how the twenty-day waiting period, which gives the Bar a brief opportunity to review advertisements before their transmission, imposes a burden that is unreasonable in relation to the goal of enforcing the rules' various substantive restrictions.

Indeed, we consider the burden placed on Florida attorneys to be minimal. In <u>Went For It</u>, the Supreme Court repeatedly characterized a "30-day blackout period" on attorney solicitation following an accident as "brief." <u>Id.</u> at 620, 633. It also minimized the petitioners' non-frivolous argument that "the Rule may prevent citizens from learning about their legal options, particularly at a time when other actors -- opposing counsel and insurance adjusters -- may be clamoring for victims' attentions." <u>Id.</u> at 633.

_____

burden on the commercial speech of lawyers who are subject to the Bar's regulatory authority.

61

Here, by contrast, we face only a twenty-day delay, and we can see no pressing need for immediate dissemination of broadcast advertisements. As the Bar pointed out in its petition to the Florida Supreme Court seeking adoption of the current Rule 4-7.7, "[m]any lawyers who advertise do so on a regular basis with a series of advertisements that change over time." Florida Bar: Petition to Amend the Rules Regulating the Florida Bar -- Advertising Rules, filed Dec. 14, 2005, Harrell Aff., Ex. 9, at 14. And even as to an unusually time-sensitive advertisement, we think that a twenty-day delay represents a constitutionally acceptable burden under the circumstances. Indeed, if the Supreme Court believes that an "obvious" alternative to a wholesale ban on lawyer advertising is "to require the lawyer to file any solicitation letter with a state agency," and if that methodology is designed to "giv[e] the State ample opportunity to supervise" attorney advertisements, Shapero, 486 U.S. at 476 (emphasis added), we cannot imagine how the twenty-day delay we face here could be impermissible. In short, Rule 4-7.7(a)(1)(A) does not amount to an unconstitutional imposition on protected commercial speech under the First Amendment.

VI.

In sum, Harrell has standing to challenge Rules 4-7.1, 4-7.2(c)(1)(G), 4-7.2(c)(2), 4-7.2(c)(3), and 4-7.5(b)(1)(A) on vagueness grounds, and those

62

vagueness claims are also ripe for review. Further, Harrell's as-applied challenge to the rejection of his slogan "Don't settle for less than you deserve" is not moot. However, although Harrell has standing to challenge all nine of the Bar's identified rules as unconstitutional encroachments on his desired speech, these as-applied claims are not ripe for judicial review, with the single exception of Harrell's attack on Rule 4-7.5(b)(1)(C), prohibiting background sounds other than instrumental music. Harrell's constitutional challenge to the Bar's pre-filing rule, Rule 4-7.7(a)(1)(A), fails because the rule is not a prior restraint and directly serves important state interests in a reasonably well-tailored fashion. Accordingly, we affirm in part, reverse in part, and remand to the district court for consideration of Harrell's justiciable claims on the merits.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**